**RECEIVED**

April 18, 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY:___ Michael Trujillo___

DEPUTY

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **BRANDON CALLIER,** | § § § | |
| **Plaintiff,** | § § | |
| v. | § § | **Case # 3:22-CV-00018-FM** |
| **AMERICAN-AMICABLE LIFE INSURANCE COMPANY OF TEXAS** a Florida Corporation, and **SOPHIA AHMED** | § § § § | |
| **Defendants.** | § § § | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW PLAINTIFF BRANDON CALLIER with his First Amended Complaint and will allege and show as follows:

### PARTIES

1. The Plaintiff is BRANDON CALLIER ("Plaintiff") a natural person, resident of the Western District of Texas, and was present in Texas for all calls, in this case in El Paso County, Texas.

2. Defendant AMERICAN AMICABLE LIFE INSURANCE COMPANY OF TEXAS ("Amicable") is a corporation organized and existing under the laws of Florida with a principal address of 425 Austin Avenue, Waco, Texas 76702 and can be served via registered agent Chief Financial Officer, 200 E. Gaines Street, Tallahassee, Florida 32399.

3. Defendant SOPHIA AHMED ("Ahmed") is a natural person, resident of Texas, insurance agent of American-Amicable Life Insurance Company of Texas, and can be served at 104 Magnolia Park Trail, Sanford, Florida, 32773.

1

## JURISDICTION AND VENUE

4. **Jurisdiction.**  This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 302.101 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds little complexity to the case.

5. **Personal Jurisdiction.**  This Court has general personal jurisdiction over the defendant because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

6. **Venue.**  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when he received a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

7. This Court has venue over the defendants because the calls at issue were sent by or on behalf of the above-named defendants to the Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

8. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a

threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

9. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

10. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

11. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

12. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

13. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

14. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

inconvenient.

15. The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

16. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

17. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

18. The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1

4

(2013).

19. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

20. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp.2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS

21. Plaintiff has been on the Do-Not-Call Registry (DNC) since December 2007 and was on the National DNC at all times relevant to this Complaint.

22. Amicable appointed Ahmed as a licensed insurance agent and gave Ahmed expressed and apparent authority to market insurance products are part of the furtherance of Amicable's business.

23. Ahmed contracted with an unknown third-party telemarketer to market and solicit insurance products on behalf of Ahmed and Amicable. Ahmed supplied the telemarketer with the age, health, income, and state of residence requirements to purchase the insurance products being marketed by the third-party telemarketer on behalf of Ahmed and Amicable.

24. Ahmed and Amicable are both aware the third-party telemarketer is using prerecorded voice message phone calls to market and solicit insurance products on their behalf and have done

nothing to stop the telemarketing campaign. Both Ahmed and Amicable continue to benefit from the telemarketing phone calls.

25. Ahmed and Amicable provided the telemarketers with access to real-time quotes and pricing information for the solicited life insurance products.

26. Ahmed authorized the third-party telemarketers to generate automated phone calls with prerecorded voice message scripts approved by Ahmed.

27. Ahmed gave access to proprietary information to the third-party telemarketers to assist in the robocalling campaign.

28. Ahmed had implied and actual authority from Amicable to coordinate sales agents' solicitation of sales of Amicable's insurance products, including through the use of telemarketing lead generation.

29. Ahmed is an agent of Amicable and the third-party telemarketer became a sub-agent of Amicable when Amicable's authorized agent, Defendant Ahmed, hired the third-party telemarketer to solicit and administer sales of insurance products.

30. The Plaintiff has received at least 19 calls within 60 days to his cell phones ending in 4604 without his prior express written consent and not related to an emergency purpose, soliciting "Senior Benefits" products on behalf of Defendant Amicable.

31. Plaintiff received multiple calls from a variety of spoofed caller IDs that contained a prerecorded message from "Kate from Senior Benefits."

32. Plaintiff logged these calls as they continued to bombard Plaintiff with unwanted calls.

33. On December 17, 2021, Plaintiff received a phone call showing 915-356-7793 on the caller ID. Plaintiff answered the phone and a prerecorded voice message began playing. The prerecorded message began with "Hi, this is Kate from Senior Benefits." Plaintiff pressed

"one" and was connected to a telemarketer who asked Plaintiff qualifying questions. The telemarketer asked Plaintiff his name, age, state of residence, and health questions in order to qualify Plaintiff for the services. The telemarketer did not identify themselves, the company the telemarketer worked for, or the company on whose behalf the telemarketer was calling.

34. The telemarketer then transferred Plaintiff to Defendant Ahmed who sold Plaintiff a life insurance policy.

35. On December 28, 2021, Plaintiff received life insurance policy number 0103531760 from Defendant American-Amicable Life Insurance Company of Texas.

36. Table below displays calls made to Plaintiff by Defendants:

| Date | Time | Caller ID |
|------|------|-----------|
| 11/5/2021 | 10:38 AM | 254-322-6741 |
| 11/11/2021 | 8:24 AM | 915-316-5830 |
| 12/2/2021 | 2:58 PM | 915-369-6096 |
| 12/7/2021 | 10:34 AM | 915-356-0637 |
| 12/8/2021 | 2:30 PM | 915-311-5373 |
| 12/8/2021 | 5:20 PM | 915-381-3428 |
| 12/10/2021 | 1:06 PM | 915-317-1616 |
| 12/13/2021 | 10:08 AM | 915-398-6650 |
| 12/14/2021 | 11:12 AM | 915-322-3433 |
| 12/17/2021 | 8:10 AM | 915-342-8307 |
| 12/17/2021 | 3:39 PM | 915-356-7793 |
| 12/21/2021 | 8:10 AM | 915-251-3129 |
| 12/21/2021 | 5:02 PM | 915-384-5051 |
| 12/22/2021 | 2:04 PM | 915-390-0404 |
| 12/22/2021 | 4:29 PM | 915-316-2385 |
| 12/22/2021 | 5:31 PM | 915-373-6151 |
| 12/23/2021 | 4:43 PM | 915-313-9902 |
| 12/27/2021 | 10:51 AM | 915-331-1157 |
| 12/29/2021 | 11:47 AM | 915-335-8543 |

37. Plaintiff received the first phone call from Defendants on November 5, 2021. Plaintiff answered the phone and heard the "Kate from Senior Benefits" recording playing. Upon

7

being connected to a representative Plaintiff was asked qualifying questions about his age
and health.  Plaintiff informed the Defendants' telemarketing representative that he was 47
and the telemarketer hung the phone up on Plaintiff.

38. On November 11, 2021, Plaintiff answered the phone and again heard the "Kate from Senior
Benefits" prerecorded message playing.  Plaintiff was again asked his age.  Plaintiff again
told the representative he was not old enough to purchase the insurance.  Upon hearing this
Plaintiff told the representative to "Please stop calling.  I am not old enough for the
insurance.  Don't call me back."

39. The phone calls continued, and Plaintiff finally told the Defendants representative he was 50
years old in order to qualify for an insurance policy in order to find out who was behind the
calls.

40. Each and every call was initiated using a spoofed caller ID, and each and every telemarketer
the Plaintiff spoke with failed to properly identify themselves and the parties they were
calling on behalf of.

41. Defendants participated in, facilitated, directed, authorized, knew of, or willfully ignored the
unlawful robocalling, while knowing facts that required a reasonable person to investigate
further, and approved, and ratified the conduct of their employees, agents, and co-
conspirators to engage in the false and misleading sales practices and unlawful robocalling.

42. Defendants Amicable and Ahmed directly participated in the phone calls by providing the
anonymous telemarketers with instructions on what states to call, the minimum age of the
consumer, the health status of the consumer, and instructions on gathering payment
information.

43. Defendants Amicable and Ahmed knowingly and actively hired offshore anonymous

8

telemarketers to make robocalls with prerecorded voice messages on their behalf.

44. Each and every call was placed without the maintenance of an internal do-not-call policy. Each and every call failed to identify the telemarketers and parties they were calling on behalf of. Each and every call was placed without training their agents/employees on the use of an internal do-not-call policy.

45. The third-party telemarketers did not identify themselves and used spoofed caller IDs causing Plaintiff to become confused as to the source of the phone calls and to misunderstand who was soliciting Plaintiff.

46. Mr. Callier has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

47. No emergency necessitated the calls.

48. Defendant never sent Mr. Callier any do-not-call policy.

49. On information and belief, Defendants did not have a written do-not-call policy while it was sending Mr. Callier the unsolicited calls.

50. On information and belief, Defendant did not train its agents who engaged in telemarketing on the existence and use of any do-not-call list.

## VICARIOUS LIABILITY OF AMERICAN-AMICABLE LIFE INSURANCE COMPANY OF TEXAS

### Actual Authority

51.     Actual authority exists when (1) a principal/agent relationship exists, (2) the principal controlled or had the right to control the alleged agent's conduct, and (3) the alleged conduct fell within the scope of the agency. See Spitz v. Proven Winners N. Am., LLC, 759 F.ed 724, 732 (7th Cir. 2014) (interpreting Illinois law, which like federal common law, accords with the Restatement of Agency, Opp v. Wheaton Van Lines, Inc., 231 F.3d 1060, 1064 (7th Cir. 2010));

9

see also *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) ("Express authority exists when a principal expressly authorizes and agent and the agent acts on the principal's behalf and subject to the principal's control.").

52.     An agency relationship was created when Ahmed hired the anonymous third-party telemarketers who acted as Defendant Ahmad's agent when they initiated robocalls with prerecorded voice messages to Plaintiff's cell phone.

53.     Defendant Ahmed exercised control over the third-party telemarketers by providing age restrictions, geographic location requirements, and physical health parameters of the solicited consumers and prescribing during what hours to make the phone calls.

54.     Defendant Ahmed entered into the telemarketing agreement in furtherance of Amicable's business of the solicitation of insurance products and was acting within the scope of her appointment as a licensed insurance agent of Amicable.

55.     Amicable exercises control and authority over its appointed agents by prescribing the manner in which agents may solicit consumers.

56.     Amicable expects appointed agents to market and sell insurance products as part of their appointment and in the furtherance of Amicable's insurance business.

57.     Amicable knows and expects appointed agents to make phone calls as part of furthering Amicable's insurance business.

58.     Defendant Amicable appointed Defendant Ahmed as an agent and gave her actual authority to market insurance products in furtherance of Amicable's business.

59.     Amicable appointed Ahmed to sell its insurance, Ahmed hired third-party telemarketers to effectuate telemarketing, and the third-party telemarketers made the unwanted robocalls on behalf of Amicable through its appointed agent Ahmed.

60. Defendant Amicable is vicariously liable under the theories of actual authority and ratification, and as well as liable because any other result would impair the underlying purpose of the TCPA.

61. Defendant Amicable is the liable party as the direct beneficiary of the illegal telemarketing calls as they stood to gain Plaintiff as a client and sold Plaintiff a life insurance policy.

62. The policy shows that the beneficial party who was gaining customers was Defendant Amicable.

63. Through Defendant Ahmed, Defendant Amicable authorized an anonymous third-party telemarketer to generate prospective customers. Defendant Amicable hired a third party to promote its products and services. Defendant's integration of robocalling into its sales process was so seamless that it appeared to an outside party like Plaintiff that the third-party telemarketer was the telemarketing department of Defendant Amicable.

### *Ratification*

64.     Ratification occurs when an agent acts for the principal's benefit and the principal does not repudiate the agent's actions. *Sphere Drake Ins. V. Am. Gen. Life Ins.*, 376 F.3d 664, 677 (7th Cir. 2004).

65.     A party "may ratify an act by failing to object to or to repudiate it," or by "receiving or retaining [the] benefits it generates." However, a party "is not bound by a ratification made without knowledge of material facts involved in the original act when the [party] was unaware of such lack of knowledge." Hodgin, 885 F.3d at 252 (citing various sections of the Restatement (Third) of Agency (2006)). Here, Amicable ratified the actions of Agent Ahmed when Amicable retained Ahmed as an active licensed agent.

66.     Plaintiff performed a search of the Texas Department of Insurance website on April 16,

2022, and verified Agent Ahmed is still appointed as an agent of American Amicable Life Insurance Company of Texas. (Exhibit A). Amicable has failed to repudiate the actions of Ahmed and has retained Ahmed as an Agent.

67.     Amicable has ratified the telemarketing campaign by continuing to allow phone calls with prerecorded voice messages beginning with "This is Kate with senior benefits" to continue to be marketed to consumers. The calls continue to be made on a daily basis to thousands, if not millions, of consumers.

68.     On April 15, 2022, Plaintiff was having a meeting with his friend James E. Shelton. Mr. Shelton received a phone call on his personal cell phone and when he answered the phone a prerecorded voice message began playing stating "This is Kate from senior benefits." (Exhibit B).

69.     Mr. Shelton was solicited a life insurance policy during the phone call referenced in paragraph 68, but the call dropped before Mr. Shelton could complete the purchase.

70.     On March 11, 2022, Plaintiff's friend, Mr. David Salaiz, received a phone call on his personal cell phone. Mr. Salaiz answered the phone and a prerecorded voice message stating "This is Kate from senior benefits" began playing. (Exhibit C).

71.     Mr. Salaiz purchased a life insurance policy number 0094771620 issued by Amicable as a direct result of the phone call in paragraph 70. (Exhibit D).

72.     The life insurance policy issued by Amicable purchased by Mr. Salaiz was sold by Amicable insurance agent Charles Turner, agent number 22690, indicating Amicable appointed agents are continuing to sell insurance through the "Kate from senior benefits" campaign. (Exhibit E).

73.     Through information and belief Amicable is aware of the "Kate from senior benefits"

marketing campaign and allows it to continue because it benefits Amicable appointed agents and Amicable.

74.     Amicable is aware of the "Kate from senior benefits" robocalling campaign and has not taken steps to end the robocalling campaign, nor has Amicable taken action against Ahmed for her use of robocalls with prerecorded voice messages to solicit insurance policies on Amicable's behalf.

75.     Amicable was served with Plaintiff's Original Complaint on January 18, 2022. Amicable has been aware of the robocalling campaign for three full months and has done nothing to stop the robocalls with prerecorded phone messages.

76.     Amicable agents continue to make TCPA violating calls on behalf of Amicable and sell Amicable products for the economic benefit of Amicable. Amicable is accepting these benefits with their eyes wide open as to the TCPA violative nature of the phone calls.

77.     Amicable has ratified the robocalling campaign by failing to stop the calls and continuing to accept the benefits of the phone calls.

78.     Another theory of ratification holds that a principal may be held liable if the principal receives or retains the benefits it generates.

79.     Amicable continues to solicit insurance policies through the "Kate from senior benefits" campaign despite full knowledge it violates the TCPA.

80.     Amicable knows Plaintiff's insurance policy was sold through a phone call that violated the TCPA, yet Amicable continues to accept the benefits of that insurance policy and others sold through the "Kate from senior benefits" robocalling campaign with full knowledge of the nature and circumstances surrounding the sale of the life insurance policies.

81.     On April 15, 2022, Plaintiff received a letter from Amicable with an offer to reinstate the

life insurance policy Plaintiff purchased from Amicable.  (Exhibit F).  Amicable is actively

ratifying the behavior of the telemarketers and Agent Ahmed by continuing to seek to reap the

benefits of the illegal robocalling campaign that was the direct and approximate cause of

Plaintiff's life insurance policy with Amicable.

### *Texas Deceptive Trade Practices Act – Vicarious Liability of Amicable*

82.    False, misleading, or deceptive acts or practices in the conduct of any trade or commerce

are hereby declared unlawful and are subject to action by the consumer protection division under

Sections 17.47, 17.58, 17.60, and 17.61 of this code.  Texas Business and Commerce Code, Title

2, Chapter 17, Sec. 17.46.

83.    Except as provided in Subsection (d) of this section, the term "false, misleading, or

deceptive acts or practices" includes but is not limited to, the following acts: (2) causing

confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods

or services and (3) causing confusion or misunderstanding as to the affiliation, connection, or

association with, or certification by, another."  Texas Business and Commerce Code, Title 2,

Chapter 17, Sec. 17.46(2), (3).

84.    The Defendants committed a deceptive trade practices act violation when they did not

identify themselves and used spoofed caller IDs causing Plaintiff to become confused as to the

source of the phone calls and to misunderstand who was soliciting Plaintiff.

85.    Insurance Companies are liable for Deceptive Trade Practices Acts committed by their

agents under Texas Law.  In *Royal Globe Insurance Company v Bar Consultants, Inc*. (1979) the

Texas State Supreme Court found:

> Neither Article 21.21 nor Section 17.46(b)(12) require either expressly or by
> implication that an agent have actual authority before an insurance company can be
> found to have vicariously committed a deceptive act or practice. Section 1 of the

14

regulations of the Board of Insurance impliedly negates such a requirement when they include acts

"... whether done directly or indirectly, and irrespective of whether the person is acting as insurer, principal, agent, employer or employee, or in other capacity or connection with such insurer." *See* note 8, *supra,* for full text.

To require actual authority would emasculate both Article 21.21 and Section 17.46 and provide a violator with an easily manufactured defense. It would only be necessary for a corporate principal to deny that an agent had actual authority to perform *694 an act, even though a reasonably prudent man, using diligence and discretion in view of the insurance company's conduct, would naturally suppose the agent possessed such authority.

There is even stronger evidence of legislative intent that the absence of actual authority of an agent is not a defense to a violation of Section 17.46 when the agent is clothed with apparent authority to do the act or make the representation. Section 17.46(c)(2) provides that in construing actions brought under the Act, the legislative intent is that:

"... the courts to the extent possible will be guided by Subsection (b) of this section and the interpretations given by the federal courts to Section 5(a)(1) of the Federal Trade Commission Act."

Numerous federal decisions made applicable to this case by Section 17.46(c), hold that lack of actual authority is not a defense if the agent is acting within the apparent scope of his authority, and not even instructions not to mislead nor diligence in preventing the misrepresentations will exculpate the corporate principal. *Standard Distributors v. F.T.C.,* 211 F.2d 7 (2nd Cir. 1954); *Goodman v. F.T.C.,* 244 F.2d 584, 591-3 (9th Cir. 1957). See Maxwell, *Public and Private Rights and Remedies Under the Deceptive Trade Practices Consumer Protection Act,* 8 St. Mary's L.J. 617, 638-39 (1977).

Embrey as a local recording agent for Royal Globe, had statutory authority under Article 21.02 and Article 21.14(2) to sell insurance policies for the company and by necessary implication to represent the coverage afforded by such policies to the consumer. If his representations were false as the trial court here found, under the explicit language of Section 16, Article 21.21 and Section 17.46(b)(12) of the DTPA, his actions constituted a deceptive act or practice for which his principal is accountable.

Though it may be harsh to hold a principal liable for the deceptive acts of his agents where he does not authorize or have knowledge that they occurred, such result is clearly called for by the legislature's enactment of the DTPA. *Woods v. Littleton,* 554 S.W.2d 662, 669-71 (Tex.1977). The rationale behind this agency principle is expressed by Justice Learned Hand when he wrote:

"... since the principal has selected the agent to act in a venture in which the principal is interested, it is fair, as between him and a third person, to impose upon him the risk

15

that the agent may exceed his instructions." *Standard Distributors v. FTC,* supra, at p.

15. *Royal Globe Ins. Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688 (Tex. 1979)

86.     Prevailing Texas State Law is clear that insurance companies are liable for deceptive

trade practices committed by their appointed agents in the commission of their duties.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE
## DETERRENT EFFECT AND PURPOSE OF THE TCPA

87. As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be

held liable for their violations of the TCPA. Courts have looked at the purpose of the TCPA

and found that not holding the sellers liable through vicarious liability would undermine the

purpose of the TCPA.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

88. Defendant's calls harmed Plaintiff by causing the very harm that Congress sought to

prevent—a "nuisance and invasion of privacy."

89. Defendant's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights

and interests in Plaintiff's cellular telephone.

90. Defendant's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights

and interests in Plaintiff's cellular telephone line.

91. Defendant's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

92. The Plaintiff has been harmed, injured, and damaged by the calls including, but not limited

to: reduced device storage space, reduced data plan usage, anger, frustration, invasion of

privacy, more frequent cell phone charging, and reduced enjoyment of Plaintiff's cell phone.

### Plaintiff's cell phones are residential numbers

93. The calls were to Plaintiff's cellular phones (915) 383-4604 and (915) 245-4374 which are

Plaintiff's personal cell phones that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phones registered in his personal name, pays the cell phones from his personal accounts, and the phones are not primarily used for any business purpose.

**Violations of the Texas Business and Commerce Code 305.053**

94. The actions of the defendants violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violates 47 USC 227(b). The calls by the Defendant violated Texas law by placing calls with a pre-recorded message to a cell phone which violate 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

95. The calls by Defendant violated Texas law by spoofing the caller IDs per 47 USC 227(e) which in turn violates the Texas statute.

**I.     FIRST CLAIM FOR RELIEF**

**(Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))**

1.     Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency

17

telemarketing robocalls to Mr. Callier's cellular telephone numbers without his prior express written consent.

3.     Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

4.     Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

5.     Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone numbers without the prior express written consent of the called party.

## II.  SECOND CLAIM FOR RELIEF

### (Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))

### (Against All Defendants)

1.     Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

    a.     a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1); [2]

    b.     training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2);[3] and,

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).

c.     in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

3.     Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

4.     Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

5.     Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making telemarketing solicitations until and unless they (1) implement a do-not-call list and training thereon and (2) include the name of the individual caller and AFS's name in the solicitations.

### III.  THIRD CLAIM FOR RELIEF:

### Violations of The Texas Business and Commerce Code 305.053

1.     Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.     The foregoing acts and omissions of Defendant and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone numbers without his prior express written consent in violation of 47 USC 227 et seq. The Defendant violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

---

[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

3.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

4.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

## IV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Callier prays for judgment against the defendants jointly and severally as follows:

A.      Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.      A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

C.      An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.      An award of $3000 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation for 19 calls.

E.      An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

F.      An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101.

G.      An award to Mr. Callier of damages, as allowed by law under the TCPA;

H.      An award to Mr. Callier of interest, costs and attorneys' fees, as allowed by law and equity

20

I.      Such further relief as the Court deems necessary, just, and proper.

April 18, 2022                              Respectfully submitted,

                                          *Brandon Callier*

                                          Brandon Callier
                                          Plaintiff, Pro Se
                                          6336 Franklin Trail
                                          El Paso, TX 79912
                                          915-383-4604
                                          Callier74@gmail.com

21